First case called for oral argument is Crystal Holton v. Henderson Associates, et al. Counsel, whenever you're ready, you may proceed. Thank you, Your Honor. May it please the Court, Counsel, my name is Thomas Magg and I represent Crystal Holton. This case concerns an injury at what can be variously described as an assisted living center or a retirement community, depending on how it's described. I think it's fair to say that the facility in question is not a traditional quote-unquote nursing home. My client, Crystal Holton, was a caregiver at the Fountains III, which is a facility located in Shiloh, Illinois. Part of my client's job duties were to assist the residents of the Fountains III in their day-to-day activities. A relevant note for today, my client was helping a now-deceased lady out of a wheelchair to use the restroom facilities, which is when the injury in question took place. The Fountains III, the employer, is not a party to this case, obviously, because of the mortgage compensation. The defendants in this case today are Henderson Associates Architects, which designed the facility, and GRS Construction, Inc., which physically built the general contractor. There is no dispute that Henderson actually designed the building, and there is no dispute that GRS Construction was the general contractor responsible for construction. In this case, the trial court dismissed the case on summary judgment grounds, finding no genuine issue of material fact and alleged compliance with a whole host of statutes, based on the testimony of the witnesses from the defendants, who were not lawyers. The simplest portion of this case I will address first, and that is the builder, GRS Construction. Plaintiffs concede that the state of the law is that if a builder builds what is designed, unless it is obviously dangerous, and there are some additional hoops, that the builder is generally not liable. We concede that's the state of the current law, and it would be up to the Supreme Court to change it. However, the builder in this case did not build exactly what was called for in the blueprints, plans, and specifications. The undisputed testimony in this case is that the grab bars in question in this case were required by the blueprints to be of a non-slip, textured finish. The testimony of my client, Crystal Holton, is that these grab bars were, in fact, smooth. Admittedly, there is a dispute as to whether or not these grab bars were, in fact, textured or smooth, but in light of the procedural posture of this case, i.e., summary judgment, all inferences and all evidence is construed in the light most favorable to the non-moving party, my client, Crystal Holton. Thus, it was error to grant summary judgment in favor of GRS because the evidence was construed in the light most favorable to the moving party. Who supported your allegation that the grab bars were not textured but were smooth? My client's deposition testimony, which is in the record. And she is how old? She would be in her early 20s. Okay, and does she have some knowledge about smooth and textured grab bars? She was the employee at the facility responsible for physically helping these people, and I don't believe it requires any expert testimony to look at a bar or feel a bar and say, hey, is this smooth? Is this rough? Is this textured? It would be like saying you need an expert to say the car is red or the car is green. I've got to ask this. Both of you, all of everybody's done a lot of work in this case. Why didn't somebody go and look at the grab bar and take a photograph of it? That's not in there anywhere. Nobody went to look at the place. Nobody did anything like that. The place was inspected. It wasn't clear to me, to be candid with you, whether or not everything was the same. As the date of the incident, when the inspection took place, it was sometime afterward. I know that there were some changes because I think everybody agreed there were some changes after the accident, some addition of a bar. Nobody can figure out which bar was involved in this case. Is that the state of the record? That is the state of the record. Was there, it seemed, the defendant seemed to indicate there was some question of causation or not knowledge on the part of your client as to what actually happened as far as a causation aspect is concerned. Could you address that, please? Absolutely. The defendants of this case seemed to blame my client's injury on the fact that after this incident took place, she walked out of the room and started pushing her back against a wall. The reason she did that is because she had hurt her back and she was trying to alleviate the pain. She was already injured at the time this took place. And the employer in the workers' compensation case, which isn't before you, took the position that she must have injured herself at that point. However, my client's testimony, which is in the record, is that she was actually injured beforehand before pushing against the wall, and it was an attempt to alleviate the pain caused by her injury. Well, I was focused mainly on whether the bar, there seemed to be some question as to whether the bar was actually involved in this. My client's testimony is that she was assisting the lady onto the commode, and that my client put, or the lady put her hands on the grab bar and could not reach them. Could not reach them. Could not reach the grab bars. And ultimately, my client was able to assist the patient, the resident, to start to get to the grab bars, but by the time, and she was actually able to start to stand, which allowed my client to start to remove the wheelchair. And about that point, it is when her hands, the resident's hands, slipped off the grab bars, injuring my client. They've got on, or one of the defendants, the construction company, on page 15 of their brief, they say, and that she, from her deposition, that she did not know one way or the other whether the grab bars had a textured finish. Plaintiff's deposition, page 59. And she said one thing one time, one thing the other? That was exactly what happened. So there is two points in the testimony. What you're reading and what they have cited, too, is where they're attempting to cross-examine her and call into question her memory. And there's an earlier statement in there, which is cited in my brief, where she testified that it was not a slip. And then I believe after that testimony, she again confirmed that it was a smooth finish. So the state of the record is there is a dispute. And, of course, at the summary judgment stage, you take the lies of the evidence most favorable to the non-moving department. As relates to Henderson Architects, perhaps it's not as clear-cut as GRS, but the state of the record in that case, or as relates to Henderson, is Henderson claims that they placed or they designed these rails in accordance with various codes, although the code is not in the record and they were never able to actually cite what relevant portion of the code they were talking about, required these rails be placed where they were. They also claim that they were prohibited by various codes, although the state of the record is nobody has ever been able to cite any code section prohibited, is that safety rails installed on the commode itself were prohibited. The plaintiff has taken the position that the grab bars that were installed should have been lowered and that had they been lowered, the resident would have been able to easily grab onto them. My client has also taken the position that very commonly used at this facility and other facilities are grab bars, safety bars, that are actually installed onto the commode. In fact, the architect, Mr. Henderson, testified that he'd been familiar with these grab bars on the commode for years and his own grandmother had used them in the past. The undisputed record in this case is that the grab bars actually could have been physically lowered and been in compliance with the ADA or Illinois Accessibility Code. The defendant, I believe, concedes that in their brief if you actually look at the measurements that they're talking about versus measurements of where the bars actually are. Those standards are minimum. They are minimum standards as well. And that's part of the argument here is mere compliance with minimum standards does not absolve an architect or a builder or a person of responsibility for exercising reasonable care of the design. That gets into the safety bars that plaintiff contends should have been installed on or alongside the toilets. While the minimum standards did not require that, a reasonable architect in the exercise of reasonably and carefully practicing their profession should have installed those grab bars on that commode. In fact, the record in this case is that other residents of this facility actually took it upon themselves to do that in many cases. And this wasn't some new design. The record in this case is that the architect's own grandmother had used these exact types of bars, I believe the record is 12 years prior. It might not be 12 years, but that time frame is a decade. But this is not new technology. And the record in this case shows that Henderson knew exactly what this facility was going to be used for. They had designed two prior facilities for the same group of companies, I should say, the Fountains I and the Fountains II. The record in this case reveals that Henderson used what Yip called a very standard design in the construction of these restrooms, consistent with what Yip put in ordinary apartments and ordinary single-family homes, and that is cited in the record. It is the position of the plaintiff that Henderson, knowing what this facility was going to be used for, having actually worked with and designed at least two prior facilities, should have gone back and said, okay, how is what we designed previously working out for the people we designed it for? You have no expert that supports that theory. I mean, the standard of care is the plaintiff's burden, and that's to be established by some expert testimony. An expert is not required in all cases, and that's the taking case, T-A-A-K-E, and that is cited in my brief. I concede an expert would be helpful in this circumstance, but I would note that the scheduling order, which otherwise would have required experts at any given time in this case, had been vacated, so there actually was no expert cutoff date in this case. Is there a difference between a non-slip bar and a textured bar? I'm using the terms generically. I think for purposes of what this Court should consider, they're substantially the same. Unless the Court has any additional questions, I don't think we do. I will address you in my rebuttal session. Thank you. Thank you, Counsel. Counsel? Good morning. May it please the Court and Counsel, Nicholas Barr on behalf of Eppley Henderson Associates Architects. The plaintiff has accurately set forth for the Court the relevant fact that Henderson Associates Architects did, in fact, design the plans for this facility, which was, in fact, an assisted care facility. The plaintiff was also accurate in his representation that Henderson had previously designed two similar assisted care facilities for this same ownership group. In this appeal, the plaintiff raises a single argument with regard to Henderson Associates. Specifically, the plaintiff alleges that the Circuit Court erred in granting summary judgment on behalf of Henderson Associates by, quote, relying only on regulations to determine the duties owed by the defendant. And that argument, we would argue, is fundamentally flawed because neither Henderson nor the Circuit Court ever suggested that simple compliance with the applicable codes serves as any bar of liability. That's just not been the argument that's not borne out in the record. It's not borne out in the order granting summary judgment. Henderson sought summary judgment and was granted a summary judgment on two specific grounds. First, that Henderson had discharged all of its legal duties to the plaintiff. As defined on the scope of the services included in its contract with the owner of the home. And secondly, that the plaintiff is unable in this record to establish any action or inaction on behalf of Henderson serve as either the legal approximate cause of her injuries. Now, Henderson's contract with the owner of the facility required that it provide complete architectural services, including code research, code compliance, and coordination with reviewing agencies to get the licensing for the home issued. It's important to note here that, contrary to plaintiff's representation, that this was some ordinary design that could be used in a residential facility or an apartment, the design of an assisted living facility in the state of Illinois is highly regulated. It's governed by the Illinois Department of Public Health. It sets forth very rigid parameters for the design of the facility, including, with relevance to this case, the size and placement of grab bars and handicapped accessible bathrooms. That statute requires that the design comply with the Americans with Disabilities Act regulations and the design parameters set forth therein, as well as the Illinois Accessibility Code. It is undisputed on this record that the design of the grab bars in this particular bathroom complied with all of those codes, requirements, and design regulations. Nothing in the record suggests that there was anything sufficient in Henderson's design of this grab bar configuration, save only the testimony of the plaintiff, which the trial court aptly noted she has no specialized skill, training, or experience that would entitle her or allow her to accurately assess the appropriateness of this configuration or this design. The court inquired of plaintiff's counsel whether anyone had ever visited the facility or inspected this grab bar configuration, and I can tell the court unequivocally, yes. Both Jamie Henderson, the principal of Henderson Associates Architects, and Gary Bockhorn, the principal of Poverty Appellee GRS Construction, both inspected the very ground the plaintiff claims to have been injured. They measured the grab bar configuration. They inspected the grab bar finish. Did they take a picture of it? Or did you ever bring into the court another one of these grab bars that is exactly the same, anything like that? There were photographs taken that were not submitted as part of the summary judgment. However, Mr. Henderson submitted an affidavit to the court specifying the dimensions of the grab bars in the room as well as the fact that the grab bars did in fact contain a non-slip, what they call safety grip finish. Did you show the photographs to the plaintiff during her deposition? I believe there were no photographs shown to the plaintiff at that time. At the time of the plaintiff's deposition, Your Honor, the plaintiff had not yet clarified which room she was injured. At the outset of the case, she claimed it was in one room number at her deposition. She clarified no, it was in fact a different room number. Following the deposition, Mr. Henderson went to the room that the plaintiff specified at her deposition and measured those grab bars. In fact, in truth, he measured both the grab bars in both rooms. And both rooms complied, and both rooms had a safety grip, non-slip finish. Now, do you agree that there is a conflict in the evidence on whether it's smooth or textured? I would agree that the plaintiff says that there was none, but it's important to note on that point, Your Honor, in her deposition testimony, the plaintiff admits she never inspected the grab bars. So, having not inspected the grab bars, she's certainly not in a position to say whether they included it or did not include it. She says that without any foundation whatsoever. Did the court make a determination that, as a matter of law, that no reasonable jury could conclude that these bars were, as the plaintiff testified to, as being untextured? The holding of the trial court, Your Honor, was that the defendant had provided unrebutted expert testimony in the form of the affidavit and deposition of Mr. Henderson, the architect, and that the plaintiff had failed to provide any vital evidence to rebut those determinations. On whether they breached their duty with regards to the placement and that type of thing? As well as the size, dimension, and finish of the grab bars. The court specified that the plaintiff had made some very specific allegations in her complaint that the grab bars were either too short, too large in diameter, or placed at a height that was too high. And the unrebutted testimony from the architect, Mr. Henderson, was that the grab bars were, in fact, the longest allowed by law, the smallest diameter allowed by law, or placed at the height required by the code. I will point out that the plaintiff is correct. There is a very small window of leeway in the height, and Mr. Henderson specifies what the regulations require, placement between a particular parameter of a few inches, and that they complied with that parameter. So the record before this court stands unrebutted. The architect did, in fact, inspect the room in question and did, in fact, confirm that the design was as is required by the applicable codes and regulations. Now, he does not argue that that simple compliance absolves him of liability. He simply states that his contract with the owner required that he design the facility in compliance with the codes, and that he did so. And that in doing so, he has effectively discharged his duties to the plaintiff and to anyone else for that matter. When you took her deposition, do you remember, she was 20 years old? Do you remember any of that, how long she'd worked there, what her background was, anything? She had no prior experience relevant to this case, Your Honor. I do recall that. She had a very good work experience in general. I don't remember her age. Okay, that's all right. But she did not have any formal education training or experience. She had simply been trained on the job for this position and had been there, I believe, a brief time. I wouldn't hazard to guess the date without looking at it. So, with regard to the architect's duty, he clearly has set forth that he has complied with his duty as defined by the scope of the services contract with the owner. As the court aptly noted, it's the plaintiff's duty in this case to set forth the standard of care by which the architect is to be governed. The plaintiff has failed to do so. All he has done is provided the testimony of the plaintiff herself, a layperson with no specialized skill or training. Certainly, in an instance like this where there is no dispute that the design in question complied with all of the regulations, it cannot be said that that design is so grossly negligent as to allow the plaintiff to proceed with a claim for professional negligence without the assistance of an extra witness. The jury is without the ability to accurately determine whether or not the defendant's conduct satisfies a particular standard of care without comparing that activity against that of other professionals in the same field. The plaintiff has failed to provide the court with any evidence of what a similar expert in this field, an architect, particularly perhaps an architect designing an assisted care facility, would have done differently. And, therefore, expert testimony is required. This is not a red car versus blue car kind of analogy, as the plaintiff would say. This is a situation where it is undisputed everything in that room was as required by the regulations. The plaintiff suggests there should have been something more, but he has no expert testimony to suggest why that more would be appropriate or even allowed. The plaintiff made several references to seat rails or chair rails attached to the commode. I'd like to address that very briefly. It's important that the court understand that the device the plaintiff refers to and the device the plaintiff has shown the defendant architect at his deposition is a home health aid, a little device that he picks up at Wal-Mart and attaches to the underside of the toilet, something that a resident may decide to use in their own home. But, critically, something that the architect unequivocally testified was not approved for new construction use. In other words, he as a design professional cannot include that in the original design of the facility. If an individual resident decides to add that because it suits their personal needs, the individual resident can do that. The design professional is prohibited from doing that by the regulations. The plaintiff's counsel is right in stating that the defendant architect did not provide the specific citation to the portion of the act or the code. Be that as it may, he unequivocally states he could not have utilized that home health aid in the design of the new construction, and further, that if he had done so, the home would not have passed inspection and could not have opened. So the plaintiff's suggestion that this was the appropriate standard by which this architect should be governed is just simply erroneous. The architect cannot be held to a standard of design that would violate the code's evaluated default. With regard to the second argument regarding proximate cause, it's also very important to note that the plaintiff testified she doesn't know what caused this elderly resident to fall. She doesn't know whether her hand slipped, whether she let go, whether she fell. She simply doesn't know. Again, I would remind the court that this plaintiff has also testified she did not even inspect the grab bar in question and could not identify any of the defect in the grab bar. When you say inspect, what do you mean? Go back and check it or was aware of it at the time that this incident occurred? You've used the word inspect a number of times. What exactly do you mean? Certainly, Your Honor. At her deposition, I asked the plaintiff, did you go back and look at the grab bar after this accident? She said no. She was asked then, how do you know that there was no non-slip finish, that there was any problems with the thing, as you allege, whether it was too short, too large a diameter, if you never looked at it. And her answer was simply, well, I worked with it. But when pressed for details, it was very clear she never performed any observation of the particular grab bar other than the passing observation that it was in the room. Was there any testimony or indication that she was aware of the grab bar and looked at it at the time of this occurrence, during the occurrence? No, quite the contrary, Your Honor. She testified she was standing behind the elderly patient, that the elderly patient rose from the wheelchair, had held on to the grab bar a sufficient amount of time for the plaintiff to move the wheelchair out from behind her, and at that point, the patient fell, knocked into her. She left the room. She did not go and look then at the bar, either before the fall or after the fall. That's clearly set forth in her deposition testimony. And again, I would just remind the Court that both defendants, the builder and the architect, did in fact go back and look at it very closely and have determined that it was in compliance and it did in fact contain the non-slip finish. In fact, the builder had submitted for the record the order sheet for the very grab bars in question, and it shows very clearly that it was what they referred to as a safety grab non-slip. It goes without saying that if the plaintiff herself is uncertain as to the mechanism of this fall, she certainly is not in a position to say what would have, quote-unquote, definitely prevented the fall. We usually see that line of cases where somebody falls in a grocery store and can't figure out later why they fell. It was because of the water or whatever. Of course, they're the ones that fell. In this instance, it's somebody else. There's no way, is it correct in this case, she could ever know that? There is no way. But then how should we be using that line of cases in a circumstance like this? Certainly where the plaintiff is attempting to proceed on a professional negligence claim against an architect with only the lay testimony of the plaintiff, it becomes certainly relevant. Let's go back to whether you need an expert or not. The approximate cost, the fact that she can't definitely say what's in the mind of this lady who now is deceased and maybe at the time couldn't have told you why she fell. Wouldn't you circumstantial? I mean, couldn't you do it circumstantially? As a general rule, of course, correct, you can use circumstantial evidence to prove a point if the evidence taken on the whole shows that that's the only possible cause of the accident. However, if the plaintiff has absolutely admitted that it could have been one of multiple causes, then you cannot rely on circumstantial evidence because it cannot be said that there is only one source of the accident. Thank you, counsel. Thank you. Counsel? Good morning, Your Honors. May it please the court and counsel, my name is Hailey Schumacher. I'm here on behalf of GRS Construction. Initially, I'd just like to point out that we do agree with our co-defendant's arguments as far as everything that he's just said at this point or up to this point, so I'm not going to belabor the court with repeating the same information. But with that being said, I do want to kind of address the three reasons that we gave for summary judgment and why summary judgment was proper with respect to those three issues. The first one was that GRS built the subject restroom in accordance with the design specifications that were given to us by Henderson Associates. The second one is that the specifications were not so obviously dangerous that no competent contractor would follow them. And the third one being the fact that the plaintiff failed to prove approximate cause when it comes to GRS and the cause of her injuries. The plaintiff has already mentioned Hunt v. Blasius, the case that he cited as far as the general rule, and then the exception that the design specifications are not so obviously dangerous that no reasonably competent contractor would follow them, so I won't go into that case. As far as GRS and building the restroom in accordance with the design specifications, as co-defendant did say, James Henderson, the owner of Henderson Associates, did inspect the restroom and the grab bars and did state that the grab bars were textured. GRS also sent shop drawings submittals of the proposed materials that they were going to use in construction of the restrooms to Henderson Associates to ensure that it was in accordance with their specifications. Henderson Associates did agree and signed those specifications, as well as Gary Bockhorn, the president of GRS, he also reviewed those specifications. Are those shop drawings in evidence, and were they considered by the court in the summary judgment? I do know that they were in evidence. I'm not exactly sure if they were considered in evidence. Are they in this record? The record itself? We don't actually have a copy of it. But I do have what's the appendix in the back of my test brief. But I do know that they were in evidence. At the end of the project, Gary Bockhorn and employees of Henderson Associates did walk through the building itself and the subject restroom to ensure that everything was in accordance with the specifications, and Gary Bockhorn did personally inspect and measure after this inspection to ensure that everything, before the project was final, that everything was in accordance with the specifications from Henderson Associates. As far as plaintiff's testimony, we do cite in our brief on pages 59 and 60, the plaintiff's testimony with respect to the grab bars. How many grab bars were there in this bathroom? I believe there were three, Your Honor. And where are they located? They were on either side, and I believe there was one above as well. I thought the plaintiff testified if there had been one on the side wall, she would have been able to be stable. Do you have her testimony? I know when she was asked about the grab bars. She said the plaintiff testified that rails being placed on both sides of the toilet would have prevented her injury as it would have allowed the resident plaintiff. The resident plaintiff was assisting to put herself on the toilet. She testified on page 55 of her deposition that the grab bars were located behind the toilet. Right. And there was one on the side of the toilet and one behind, and then one in the shower. So that's her testimony. Is that in the record where they are located? Yes, it's on page 55 and 56 of the plaintiff's deposition. Okay. She was also asked as far as whether or not she looked at the grab bars. She mentioned this twice. The first time when she was asked whether they were smooth or textured, she said that they were definitely smooth. And then as the co-defendant said, when she was asked about that, she said she just knew because she worked there. She had not looked at the grab bars themselves. She was asked twice whether she had ever looked at them, and she said no. And that is on page 59 and 60 of her deposition transcript. With respect to the design specifications being not so obviously dangerous that no competent contractor would follow them, as co-defendants said, the design specifications were in compliance with numerous state and federal regulations, including the Americans with Disabilities Act, the Illinois Accessibility Code Standards, and they were also approved by the Illinois Department of Public Health. And that is important because, as co-defendants said, the Illinois Department of Public Health approves all building and construction and design of these assisted living facilities. So the fact that they were in compliance with that is important. Plaintiff argues some possible other things that could have been done to make this a little bit safer for the plaintiff and for any patient that would use or any person that would use the restrooms in this particular case. However, as is described in the Supreme Court case Hunt, the existence of an alternative design does not equal a legal duty. Here we were given the design specifications that were in compliance with the Americans with Disabilities Act and all the previous state and federal regulations that I've cited. You can finish your sentence, too. So the fact that she, the fact that there may be an alternative design doesn't necessarily equal a duty if we complied with the specifications that were provided to us that were in compliance with state and federal law. Thank you. Thank you, counsel. Counsel? If you get caught at the end of the middle of a sentence, you can finish yours also. Thank you, Judge. I would just simply note that there is a genuine issue of material fact here. My client, it's in the record C573. It's her deposition page 142, lines 21 through 22 states that these grab bars were smooth. That's in the record. In answer to your question, are the design drawings in the record? Yes, they are. Unless the court has any specific questions. Is there anything you were able to develop as to why all these people have signed these affidavits and looked at these professional people, why they would be lying? Because that's what they're doing. Somebody's lying or somebody's mistaken, one of the two. And your client goes both ways. She could be mistaken, but they've got to be lying. I don't think the defendants have to be lying in order for them to be wrong. The question is not a year, two years, however long after the accident, what's there. The question is on the date of the injury and what was originally installed. The undisputed evidence in this case is that the room had actually been changed after this incident had taken place. It's entirely possible, and it would result in both my client telling the truth as to what was there on the day of the incident and the defendants telling the truth as to what was there when they went to look at it. Somebody could have gone in there after Crystal Holton was injured and said, Oh, my, this isn't in compliance with the plans. Let's change what's here. In fact, the undisputed evidence is there's an additional grab bar there today that wasn't there either on the date of my client's injury and that isn't called for in the client's specifications. So it's not necessary that anybody was lying. It's simply the affidavits set forth by the defendants say what was there substantially after the fact. Okay. Nothing further. Thank you. Thank you. We appreciate the briefs and arguments.